**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| **JANE DOE, individually and as mother and putative next friend of DOECHILD I and DOECHILD II, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:15-CV-05052-MDH** |
| **JOPLIN SCHOOLS PUBLIC SCHOOL DISTRICT, et al.,** | ) | |
| **Defendants.** | ) | |

## ORDER

Before the Court are cross Motions for Summary Judgment filed on behalf of all parties. (Docs. 51 and 52). The pending motions present this Court with the question of whether Plaintiffs' right to religious freedom, as guaranteed by the Establishment Clause of the First Amendment, was infringed by the Joplin School District's relationship with Victory Ministries and Sports Complex. The issues have been fully briefed and the matter is ripe for review. Based upon the filing of cross-motions, the parties agree this case is appropriate for resolution based on the undisputed facts set forth in the dispositive motions.

## BACKGROUND

### 1. The Parties

The Plaintiffs are students enrolled in the Joplin Schools Public School District, a/k/a Joplin R-VIII School District (hereinafter the "Joplin District"), and their mother, who is both a resident of the Joplin District and a tax payer in that district. The mother is a humanist. She

does not practice any specific religion and does not wish her minor children to do so. The Defendant, Joplin District, is a public school district organized under the laws of the State of Missouri that operates with public funds collected from local and state taxes. Also named as Defendants, in their official capacity only, are Norman Ridder, Interim Superintendent of the Joplin District, and Brandon Eggleston, Principal of North Middle School in the Joplin District. Defendant Ridder was not Interim Superintendent at the time of the events which led to this litigation. The Superintendent at that time was C. J. Huff, who is no longer affiliated with the Joplin District.

Victory Ministries & Sports Complex ("Victory") is a Christian ministry that, according to its website, operates for three stated purposes: (1) Exalt Jesus, (2) Expand the Kingdom of God, and (3) Equip the Body of Christ. Victory's goal is to "Keep Jesus Central in Everything We Do," and "Have God Honoring Entertainment." The Victory By-Laws declare that the specific intent of the organization is to "share from the Bible, God's message of love, forgiveness, and reconciliation for all people through Jesus Christ at a local, regional, national, and even international level." The Statement of Beliefs contained in Victory's By-Laws requires "everyone involved in our ministry to act in a manner that promotes and supports these beliefs."[1]

The By-Laws give the Board of Trustees, and its designees, the authority to "refuse service to 'users' or 'renters' of the facilities and grounds, which they believe or suspect may be in support of or offer a service, product or message that conflicts, or may conflict with, the biblical values held by Victory Ministry and Sports Complex." Jack Frost, the CEO of Victory,

[1] Those Christian beliefs include inerrancy of the scripture. The By-Laws specifically identify organizationally prohibited behaviors, including: "theft, lying, dishonesty, gossip, slander, backbiting, profanity, vulgarity, sexual promiscuity (including adultery, homosexual behavior, and premarital sex), drunkenness and immodesty of dress."

testified that Victory specifically prohibits renters or users of its facility from expressing beliefs that are not "biblically sound" while on its premises. Mr. Frost further testified that Buddhists or Hindus are prohibited, as set forth in the By-Laws, from renting the facility for non-Christian religious activity and that the By-Laws prohibit "non-Christians" from engaging in any "non-Christian" religious activities while on the premises.

### 2. The Relationship Between Joplin District and Victory

Victory is operated by Victory Ministry, formerly known as Bridge Ministries. The facility is used to further the ministry of Victory as described above. Prominently displayed throughout the recreational facility is the Victory logo, which includes a Christian cross as the letter "T." Also throughout the facility are various banners and signs depicting messages consistent with Victory's mission. For example, displayed at various locations within the recreational facility are banners that have displayed messages such as: "Jesus Is Worthy Of It All;" "Hope The Confident Expectation That What God Has Promised Is True;" "Worship A Feeling Of Profound Love & Admiration;" "Vision Lord We Want To See What You Say We Have Access To, Come To Pass;" "Fight The Good Fight Of Faith;" and "Thanks be to God! He Gives Us The Victory Through Our Lord Jesus Christ." Literature filled with messages consistent with Victory's mission is also available in the recreational facility.[2]

In the spring of 2015, the Joplin District's North Middle School conducted two field trips to Victory's recreational facility - one for sixth and seventh graders, and another for eighth graders. During that time, one of the Plaintiffs was an eighth grade student at North Middle

[2] Examples of the literature include fliers and pamphlets that feature the Victory Ministry logo; a flier titled "Exalt Jesus, Expand the Kingdom of God, God's Word;" a flier listing Victory's purposes and goals; a brochure advertising Victory worship sessions; and a brochure captioned "Stretch Your Faith," referencing a biblical verse and the Christian ichthus.

School. Plaintiff's field trip was reportedly designed to motivate and reward students for their Missouri Assessment Program (MAP) Achievement Test preparation and performance, and to further reward students for good behavior during the assessment process. Most, but not all, of the North Middle School eighth graders qualified for the trip. The field trip occurred during regular school hours. The eighth grade trip was held on May 7, 2015, and lasted approximately 3 ½ hours. Students ate lunch at Victory. Nine school officials attended the field trip, including Defendant Eggleston. Public school busses transported students to the facility. School faculty who attended the field trip were compensated through public tax monies, and expenses associated with school bus transportation were also paid by the school district with public tax money. The Joplin District paid Victory $5 for every student who attended. Together, the two middle school field trips resulted in a district payment to Victory of approximately $2,500.

Students at North Middle School were allowed to vote for one out of three options regarding where they wanted to have their class field trip. The Joplin District contends a majority of the students voted for the trip to Victory. The North Middle School field trip to Victory was organized and planned by Defendant Eggleston and the North Middle School faculty.

At some time prior to the field trip, a letter was forwarded to the Joplin District by Victory suggesting use of its facility as a venue for school trips. The letter included fliers that included the Victory logo with the Christian cross and the word "ministry." Also included in one of the fliers was a testimonial from a Joplin High School official describing past Joplin High School events at Victory. Defendant Eggleston visited Victory's recreational facility at least twice before the North Middle School field trip. The first time he visited was when it was being operated by Bridge Ministries, and the second time was in May 2014 for a district-wide

secretaries' luncheon the school district hosted at the facility. The North Middle School field trips to Victory were specifically approved by Jason Cravens, the Joplin District's Executive Director of Secondary Education, and by then Superintendent of Schools, Dr. Huff.

On or about May 4, 2015, North Middle School sent home permission slips and waivers with students for parents to sign as a requirement to attend the trip. The waiver was stapled to the permission slip. Parents were required to sign the waiver in order for their child to attend the field trip at its facility. (See Doc. 51-16, "Waiver and Release Form"). It was a Victory requirement.

Paragraph 6 of the March 17, 2015 waiver and release form reads:

> ¶ 6. We (I) understand that the officers, officials, agents, other participants and employees of Victory Ministry and Sports Complex may be inviting me or (my) our students to Bible studies and local churches of the Christian faith. While at any Victory Ministry and Sports Complex location or event (my) our student(s) has permission to participate in worship services, Bible studies or any other activities that may pertain to the Christian faith.

Defendant Eggleston read the waiver and release form prior to the field trip. Also included in the waiver and release form was Paragraph 10, which reads as follows:

> ¶ 10. We (I) hereby grant Victory Ministry and Sports Complex the absolute right and permission to copyright and use, re-use, publish, and republish photographic portraits, pictures and/or videos of me and/or our (my) child or in which I and/or our (my) child may be included in whole or in part, or composite or distorted in character or form, without restriction as to changes or alterations, in conjunction with our (my) child's own or fictitious name, made through/for any medium for use in any art, advertising, trade, or any other public purpose whatsoever. I also consent to the use of any material printed in conjunction therewith. I hereby waive any right that I or the minor may have to inspect or approve the finished product or products or the advertising copy of printed matter that may be used in connection therewith or the use to which it may be applied.

The waiver and release form was revised effective November 16, 2015. (See Doc. 51-16). The Paragraph 6 language contained in the original waiver and release form does not appear

in the revised form. The language contained in Paragraph 10 of the original release form is contained in Paragraph 9 of the revised form. The revised form contains new Paragraphs 11 and 12 that allow the Victory staff to remove "Participants who engage in disrespectful or harmful behavior or who refuse to abide by instructions provided by Victory Ministry and Sports Complex staff, . . ." Paragraph 12 of the revised agreement allows Victory to refuse service to users "which they believe or suspect may be in support of, or offer a service, product or message that conflicts, or may conflict with the values held by Victory Ministry and Sports Complex." In addition, Paragraph 10 "Acknowledgment of Purpose" states "Parent/Guardian and Participant acknowledges and understands that Victory Ministry and Sports Complex is organized and operated for Christian purposes."

The Joplin District and Victory entered into a building use agreement. That agreement includes the following preamble: "WHEREAS, Victory Ministry & Sports Complex owns premises located at 3405 S. Hammons Blvd, Joplin, Missouri 64804, which is normally used for family and youth Christian outreach . . ." Paragraph 4 of the agreement provides: "4. User agrees to not use the premises for any purpose that is contrary to the mission, purposes or beliefs of Victory Ministry & Sports Complex, which is a biblically-based organization."

Approximately 339 sixth and seventh grade students and approximately 164 eighth grade students attended field trips to Victory. Prior to the field trip, the Joplin District received inquiries questioning the propriety of the trip. Based on these complaints, Defendant Eggleston e-mailed then Superintendent Huff noting that the trip was not mandatory and no child was required to attend. Additionally, Defendant Eggleston contacted the Victory staff and was assured there would be no "preaching" to the students. When Superintendent Huff was contacted by the American Humanists Association expressing concerns that the trip would

violate the Establishment Clause, he acknowledged that the permission slip was inappropriately worded but denied the trip violated the Establishment Clause. Superintendent Huff was made aware that if the trip proceeded as scheduled, litigation would likely ensue. In response to the complaints, Principal Eggleston agreed that in the future, if the venue was to be used for trips, a request would be made to omit paragraph 6 from the Victory waiver and release form.

When Victory learned of parents' concerns, they informed the Joplin District that parents could strike paragraph 6 from the waiver and release form if they so desired. However, Superintendent Huff, Defendant Eggleston, and the Joplin District determined not to advise parents of their option to strike out paragraph 6 of the waiver, and to "go on as it's written." Defendant Eggleston met with the North Middle School faculty attending the trip, instructing them to monitor Victory employees to ensure no proselytization occurred. However, Victory staff present during the North Middle School field trips were not given instructions regarding proselytization.

While the North Middle School field trips were the events that precipitated this litigation, they are not the only examples of the Joplin District's use of Victory facilities. The Court notes other schools within the Joplin District have also used Victory facilities on numerous occasions.[3] For example, the Joplin District regularly hosts high school excursions to Victory facilities for abstinence-only sex education titled "Battle of the Sexes" provided by Life Choices, a Christian-

[3] Victory's webpage includes a testimonial from Tobin Schultz a Joplin High School official, which states, "Hosting events at Victory Ministries has had a tremendously positive impact on the students and staff of Joplin High School. The staff, facilities, and climate create an exceptional atmosphere that promotes team building, leadership development, and growth in self-confidence. Going to Victory has created experiences that could not be replicated in the traditional, high school environment."

based organization.[4] The trips take place during school hours, and school busses take the students to the Victory facilities. The trip is considered part of the "curriculum" of the Joplin District.[5] The adults who teach the Joplin High School students while at Victory are selected by the Connection Institute, the prevention services arm of Life Choices.

Life Choices programming held at Victory for Joplin High School students does not include information about contraception or abortion - they teach abstinence only. Battle of the Sexes is the incarnation of a program that started in 2010 by Melissa Winston at Life Choices called "Man Up" for boys and "My Life" for girls. Winston was previously Youth Development Coordinator for Life Choices Medical Clinic and Resource Center. Since November 2013, Winston has served as Director of Community Engagement for the Joplin District. The Man Up/My Life events have been held at Victory or its predecessor since 2010. Approximately 800 Joplin High School students are transported to Victory during school hours and attend Battle of the Sexes Life Choices program each year.

On March 11 and 12, 2014, Joplin High School took its junior class to Victory for a two-day Battle of the Sexes event. The event was held from 1:00 – 3:00 each afternoon and approximately 800 students attended. On March 11, 2014, Victory posted information on its official Facebook page captioned "Victory Worship Sessions" describing the Joplin High School Battle of the Sexes event, along with four pictures from the event. One of the photos posted on the March 11 Facebook page shows a Joplin school bus parked in front of a large Victory banner

---

[4] Life Choices states that it believes "there is a divine purpose and plan for every child that is conceived." In its 2015 report, Life Choices boasted that its staff has provided 22,000 spiritual discussions and more than 6,600 of its clients choose life for an unborn child.

[5] Photos of the Joplin school bus and Joplin students attending the life choices sessions at Victory are published on Victory's Facebook page, along with statements such as "God's faithfulness endures forever."

with the Christian cross in the middle. Another shows Joplin students inside the lobby of the main entrance. On March 12, 2014, Victory posted a second message on its Facebook page, "Victory Worship Sessions," about the JHS Battle of the Sexes event, along with four pictures. The post stated:

> Good Wednesday Morning!
> We started out this day with worship and prayer for our schools, community and nation...believing that God is in control and worthy to be praised! This morning's session led by Joshua Bussey. God's faithfulness endures forever! ….
> Once again, thank you Joplin School District for allowing us to pour into these students' lives.

In addition, the Joplin High School regularly uses, and pays Victory for the use of, Victory facilities for its cheerleading practices and "Fusion" events, which are school initiatives for seniors and juniors to support freshman students.

Two elementary schools in the Joplin District, Soaring Heights Elementary and Columbia Elementary, also took school children to Victory's facilities for celebration field trips in May of 2015. Victory required parents of both schools to sign the waiver and release forms before their children could attend the event. A building use agreement, similar to the one executed for the North Middle School trip, was executed for each of the trips. The Joplin District also paid Victory for these trips, which took place during school hours.

Finally, the Joplin District hosted a district-wide secretary luncheon at Victory's facility. Approximately 150 school officials, students and the North Middle School jazz band attended the luncheon. The Joplin District again signed Victory's building use agreement for the secretary's luncheon and the Joplin District paid Victory at least $200 to rent the facility for the luncheon.[6]

---

[6] See e.g. Doc. 51-14; (An itemization of the Joplin District's use of Victory facilities for trips.).

### 3. Plaintiffs and Victory

Doe Child I was eligible to attend the North Middle School eighth grade field trip rewarding students for effort on the MAP test. However, when he presented the waiver to his mother, and discussed it with her, both agreed he should not attend due to the religious nature and beliefs of Victory. Doe Child I's mother visited the Victory website and learned more about its unambiguous Christian mission and purpose. She objected to signing a waiver allowing her child to be proselytized on a school trip. She did not want her child to be exposed to Christian indoctrination, including Christian Bible study and messages. Doe Child I had voted in favor of bowling as the reward field trip for the eighth grade class.

The Doe family is not Christian. Victory's Christian messages directly contradict the religious beliefs of the Doe family. Messages contained on the signs displayed at Victory, described in the literature at Victory, and contained in the Victory By-laws, all contradict the Doe family beliefs. Doe Child I believed participation in the field trip would symbolically and tangibly support the Christian mission of Victory, against Doe Child's convictions. Doe Child I wanted to attend the eighth grade class field trip with classmates, but didn't participate because of beliefs and concerns that the trip was to a religious ministry and that it would be uncomfortable as a non-Christian based on the possibility of Christian messaging, ministry, invitation, and prayer. Doe Child I did not want to openly identify as a non-Christian in front of classmates and school faculty during a field trip to Victory. Doe Child I felt sad and left out when he was put in the position of having to choose between attending a religious school-sponsored event and forgoing participation entirely. Further, Doe Child I would have been very uncomfortable in a setting where Christian messages that directly contradicted Doe Child's beliefs were a focus.

In March 2015, Doe Child III, a freshman at Joplin High School, was sent to Victory on a school field trip without his mother's knowledge or consent. Doe Child III was not given a permission slip or any other form to fill out prior to the trip. The trip was part of the regular school day. Doe Child III felt uncomfortable as a non-Christian with the Christian nature of Victory. Doe Child III was exposed to Christian crosses and banners with Christian messages. At Victory, Doe Child III was exposed to sex education instruction conducted by employees of the Christian-based organization, Life Choices, rather than public school teachers. The instruction was abstinence only. Prior to the trip, the Doe Child's mother had disallowed her children from participating in sex education class at North Middle School when she learned that Life Choices was instructing the class, rather than public school teachers. While Doe Child III wishes to participate in all class-wide school events, educational opportunities, and field trips, Doe Child III does not want to attend future events at Victory, or any religious venue or events with Christian based messages. Doe Child III is uncomfortable at such Christian religious venues, and does not want to be forced to tell his friends that he is an atheist. While the Doe family children have not been exposed to Victory facilities for cheerleading practices or "fusion" events, which are more commonly associated with high school students, they could confront those issues as they advance to the high school grades.

**STANDARD OF REVIEW**

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*,

653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**PLAINTIFFS' STANDING**

Defendants make a brief argument that Doe Child I does not have standing in this case because Doe Child I did not participate in the field trip and therefore was never exposed to any Christian messages. Defendants do not cite any case law to support this argument and the Court finds this argument is without merit.

The Court finds Plaintiffs have standing, at a minimum, because "parents have a cognizable interest in their children's religious education." *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492, 1495 (8th Cir. 1988) (internal citations omitted) ("parents have standing to challenge school-sponsored religious activities that affect their children"). Here, Jane Doe has brought the claim on behalf of her minor children. As a result, standing exists for the parental interest to have one's children educated in a public school that does not impose or permit religious practices. *Id.* (internal citation omitted).

**DISCUSSION**

The parties agree that the three-prong test adopted by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2125, 29 L. Ed. 2d 745 (1971), provides the framework of this Court's analysis of whether the actions of the Joplin District violate the Establishment Clause

and infringe upon Plaintiffs' First Amendment right to religious expression. Under this analysis, the Court looks to see: (1) whether the government action has a legitimate secular purpose; (2) whether the principal or primary effect of the government action neither advances nor inhibits religion; and (3) whether the government action fosters an excessive government entanglement with religion. *ACLU Nebraska Found. v. City of Plattsmouth*, 419 F.3d 772, 775 (8th Cir. 2005) (en banc)(internal citations omitted). State action violates the Establishment Clause if it fails to satisfy any one of these prongs. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S. Ct. 2573, 2577, 96 L. Ed. 2d 510 (1987). One factor cited by courts applying the *Lemon* test is whether the government action tends to coerce someone to support or participate in any religion or its exercise. See *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655, 120 L. Ed. 2d 467 (1992).

Tradition and the context of the government action are also appropriately considered. See e.g., *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1825, 188 L. Ed. 2d 835 (2014)).[7] Regardless of the specific test applied, the Establishment Clause clearly does not compel the government to purge from the public sphere all that in any way partakes of the religious. *Van Orden v. Perry*, 545 U.S. 677, 699, 125 S. Ct. 2854, 2868, 162 L. Ed. 2d 607 (2005), citing *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); see also *Stark v. St.*

[7] In applying the *Lemon* analysis, it is important to understand the historical context which led the framers of the Bill of Rights to include protections of religious freedom and prohibitions against government establishment of religion in the Bill of Rights. European monarchs, under whom ancestors of the framers of the Bill of Rights lived, used the authority of their position to advocate personal religious beliefs, reward those who shared them, and punish those who did not. Expressing religious beliefs contrary to that of the monarchy could result in death under a charge of heresy. The framers of the Bill of Rights sought not only to preserve individual religious freedom, including the freedom from religion, but also to prohibit any effort by government to establish, or advance any religion or religious theology as preferred or favored.

*Cloud State Univ.*, 802 F.2d 1046, 1049 (8th Cir. 1986). The government must not "place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling non-adherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9, 109 S. Ct. 890, 896, 103 L. Ed. 2d 1 (1989); see also *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 422 (8th Cir. 2007).

The Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. at 583.[8] There are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. at 592 (1992)(internal citations omitted); see also *Stark v. Saint Cloud State University*, 802 F.2d 1046, 1051 (8th Cir. 1986). Parents have a constitutionally protected interest in guiding the "religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). They have a right to have their children "educated in public schools that do not impose or permit religious practices." *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d at 1495 (internal citation omitted). Further, a public school cannot "force a student to choose between attending and participating in school functions and not attending only to avoid personally offensive religious rituals." *Skarin v. Woodbine Cmty. Sch. Dist.*, 204 F. Supp. 2d 1195, 1198 (S.D. Iowa 2002).

---

[8] Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. *Edwards v. Aguillard*, 482 U.S. at 584.

The Eighth Circuit has found violations of the Establishment Clause in the following scenarios: when teachers were required to attend training at a religious college, see *Warnock v. Archer*, 380 F.3d 1076 (8th Cir. 2004); when university students taught at parochial schools, see *Stark v. St. Cloud State Univ.*, 802 F.2d 1046 (8th Cir. 1986); when a private group was allowed to distribute Bibles during school hours, see *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556 (8th Cir. 2009); when the school district offered Bible classes taught by volunteers not acting on behalf of any church, even when the classes were voluntary and not for school credit, see *Doe v. Human*, 725 F. Supp. 1503, 1504 (W.D. Ark. 1989), aff'd, 923 F.2d 857 (8th Cir. 1990); when faculty members led students in prayer, see *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492 (8th Cir. 1988); and when schools participated in religious baccalaureates, see *Warnock v. Archer*, 443 F.3d 954 (8th Cir. 2006).

**THE *LEMON* ANALYSIS**

**1. Did the District's Practice Serve a Secular Purpose?**

The secular purpose must be the preeminent and primary force driving the government's action, and it must be genuine, not a sham. *McQueary County v. ACLU*, 545 U.S. 844, 862-864 (2005). The government must "show by a preponderance of the evidence that the action challenged" has a secular purpose. *Church of Scientology Flag Service v. City of Clearwater*, 2 F.3d 1513, 1530 (11th Cir. 1993). Defendants argue the purpose of the trip to Victory was secular in purpose because it was a reward for students to encourage productive behavior during MAP testing. Defendants further argue the purpose of motivating students to qualify for the reward is secular and if a qualifying student did not want to participate, or did not return the proper forms, the student could be rewarded by free time in the North Middle School gym.

The Court agrees that, on its face, a field trip rewarding student preparation and/or performance in testing appears to be a valid secular endeavor by the Joplin District.[9] However, such a facial analysis fails to give proper weight to the first prong of the *Lemon* analysis. While an appropriate secular excuse for the Joplin District's relationship with Victory can be assigned, a more in depth analysis is warranted.

Here, even if the Court finds the Joplin District can provide a valid secular purpose for the activities at issue, these valid secular objectives can be readily accomplished by other means. See e.g. *Stark v. St. Cloud State Univ.*, 802 F.2d at 1049 (internal citations omitted). In fact, the secular purpose of rewarding the students for MAP testing, and the other Joplin District activities discussed herein, can easily be met without affiliation with a religious organization. School districts across the nation have field trips, cheerleading practice, secretarial recognition banquets, sex education curriculum, and student bonding events without affiliations to religious organizations. The Court finds despite Joplin District's secular purpose for the trip the same objectives could be reached without subjecting students to the religious messages and beliefs held by Victory. Further, as discussed herein, even if the Court finds the trip was secular in purpose, that cannot validate the Joplin District's trips to Victory when the effect was to advance religion and improperly entangle Joplin District with Victory.

**2. Was the Primary Effect to Advance Religion?**

While Victory's right to arrive at its beliefs, follow its beliefs, and to share its beliefs is absolutely and unequivocally constitutionally protected, it must advance those rights without the

[9] The same would apply to a banquet honoring district secretaries, practice for a cheerleading squad, sex education classes, and programs to enhance bonding and relationships between older high school students and new high school students.

support, advocacy, or assistance of publicly funded governmental entities. Here, the Joplin District made its students available to Victory, and as a result subject to its religious messages at public expense, during the school day. While Defendants claim no direct sharing of religious messages occurred during the field trips, the plain and unequivocal language of the waiver and release form permits Victory to invite students to Bible studies and local churches, and for students to actually participate in worship service, Bible studies, and any other activity pertaining to the Christian faith. In addition, during visits to Victory there were various signs displaying religious messages prominently displayed throughout the facility and religious literature made easily available to the students. Further, the waiver and consent form allows Victory to photograph and/or video students, and to include those videos or photographs, without restriction, using the student's actual name in advertising for their Christian ministry. Finally, the Joplin District paid significant sums from public tax dollars to Victory. Together, these things clearly advance the mission and purpose of Victory.

The Court finds that the students, such as the Doe Child Plaintiffs who hold religious beliefs contrary to those of the Christian religion, would rightfully feel coerced by the Joplin District's field trips, into either not attending the events, or subjecting themselves to religious beliefs contrary to their family's teaching. No parent can be required to subject their children to Bible studies, worship service, "or any other activity that pertains to the Christian faith," in order for their child to take advantage of the opportunities of a public school system. Similarly, no Christian organization can be empowered to exclude those of other faiths from events sponsored by public schools.

Defendants argue that when complaints were received, they obtained permission from Victory to have parents strike paragraph 6 from the waiver and release form. However,

Superintendent Huff and Principal Eggleston inexplicitly chose not to communicate that information to parents and students. That decision alone raises serious concerns regarding the purpose and motivation of school district officials. It is puzzling to this Court that school officials chose not to communicate that message to parents. Actually, it is shocking the school officials distributed the waiver to parents to begin with knowing it contained the provisions of paragraphs 6 and 10. In any event, striking paragraph 6 from the waiver and consent form does not alone resolve the constitutional issues associated with the Joplin District's trip to Victory.

Defendants accurately point out that the waiver and release form was changed after complaints regarding the eighth grade field trip were received. The November 16, 2015 revised waiver and release form deletes paragraph 6. However, it retains paragraph 10 of the earlier release form (now renumbered as paragraph 9), which requires participants to grant permission for Victory to use the likenesses of the participants for advertising, trade, or any other purpose whatsoever. Victory did, in fact, use photos of school events and the Joplin District's school busses in its advertising and marketing. A public school student cannot be required to allow his or her likeness to be used in advertising for a Christian ministry in order to take advantage of opportunities sponsored by public schools funded by public tax money.

Newly added language in the revised release form raises new, additional, First Amendment constitutional concerns for students not sharing Victory's religious beliefs. For example, paragraph 11 allows Victory to remove anyone from the property if they fail to abide by "instructions" provided by Victory staff. To the extent those instructions are unrelated to the Christian ministry and message of Victory, and instead related to safe use of the facility, preservation of the facility, or orderly and physically safe conduct, such a provision seems reasonable and constitutionally permissible. However, if those instructions were to include

requirements to participate in prayer, Bible study, or worship (which, as worded, would be possible) the clause would be constitutionally unacceptable for a public school field trip.

Further, paragraph 12 of the revised agreement allows Victory to refuse service to participants whom they "believe or suspect may be in support of, or offer a service, product *or message* that conflicts or may conflict with the values held by Victory Ministry and Sports Complex." (*emphasis added*). On its face, this would seem to allow Victory to exclude individuals who express religious beliefs other than Victory's. Further, it would allow the exclusion of gay and lesbian students, since that lifestyle is contrary to the values expressed in Victory's By-Laws. The waiver and release form language is so broad that it allows Victory to refuse service to people who stay silent, but hold religious beliefs which require them to wear attire required by their own religious beliefs, or who chose to wear certain symbols not consistent with Victory's Christian beliefs. The Constitution may protect the right of Christian ministries to restrict events at its facilities to those with similar beliefs. However, it does not allow public entities providing public education to engage in such restrictions, and does not allow such authority to be delegated to private religious organizations. The programming and opportunities of public education must be made equally available to persons of all religious faiths, and all Christian denominations and beliefs, including those who do not believe in any religion.

The relationship between the Joplin District and Victory concerning sex education programming is also problematic. While it is not the purpose of this Court to control, dictate, or write the curriculum of the Joplin District, it is the responsibility of this Court to protect the constitutional separation of church and state. The fact that the Joplin District uses public tax money to transport students to a Christian facility to be taught a sex education "curriculum" by representatives of a Christian organization, rather than public school teachers, is of grave

concern. So too is the fact that the Christian organization relishes that the opportunity allows it to "pour into" the students' lives.

Joplin District's use of Victory facilities, including the waiver and release forms required by Victory in order for students to participate in school functions at Victory, indicates Joplin District's approval of Victory's religious messages. As a result, and for the reasons stated herein, the Court finds the primary effect of Joplin District's trips to Victory does in fact have the primary effect of advancing religion.

### 3. Is the Joplin District Improperly Entangled with Victory?

The individual religious freedom guaranteed each of us by the First Amendment to our Constitution would be placed at serious risk if public officials, wielding the power and authority of government, were allowed to use the power and authority of government office or position to aid, advance, or advocate for their own personal religious beliefs or religion, or to exclude those with beliefs other than their own, from opportunities or services of government. This is true even if the religious beliefs of those officials are consistent with or are shared by a majority of local residents served by the government unit.

Entangling school district operations, curriculum, activities or opportunities with those of a religious organization or religious belief set is not permitted. Certainly, occasional use of a facility owned by a religious entity for a school function may be permissible without being considered impermissible entanglement. Here, however, the frequency, consistency, and extent of the relationship between the Joplin District and Victory goes well beyond occasional or incidental use and impermissibly entangles the Joplin District with religion. This would be true even if the glaring failures of the waiver and consent form were to be revised consistent with the concerns expressed in this Order.

Some who share Victory's religious beliefs may believe that requiring a separation between their religious beliefs and their advocacy for those beliefs and the school district is bad public policy and even contrary to the best interest of the individual students of the district. The Court reminds those that not all parents in the Joplin District share their beliefs. The government cannot pick from among the many religious beliefs of those it governs which it wishes to advance. While conservative fundamental evangelical Christian beliefs, such as those expressed by Victory, may predominate in the Joplin District, they are not universal. Additionally, we should remain mindful that our Constitution does not apply solely to the Joplin District, but to public school districts across the entire country. In fact, in many corners of this country the predominating Christian beliefs of the community may differ from Victory's Christian beliefs. For example, in other communities the majority's beliefs may be Catholic, Methodist, Lutheran, Episcopalian, Church of Christ, Presbyterian, Jehovah's Witnesses, Mormon, or other denominations. Further, in some districts, the majority may hold non-Christian beliefs, including the beliefs of Muslim, Hindu, Jewish or Scientology religions. By consistent application of the principles espoused in this Order, government units in those geographic areas will be prohibited from becoming entangled with those religious organizations and will be prohibited from using government authority from advancing those beliefs. In those circumstances, parents of children who hold conservative fundamental evangelical Christian beliefs consistent with those of Victory would likely be very pleased and advantaged by the religious protections afforded by the First Amendment.

Any contest for supremacy between religious organizations or among religious beliefs is broadly protected by the First Amendment. So too is the right to not believe in any religion.

However, any such contest for favor among the people of this country must be waged and conducted without the power, authority, or resources of government taking sides.

The Court finds the relationship between Joplin District and Victory, and in particular the seventh and eighth grade field trips and sex education programming, to be an impermissible entanglement of government, government funding, and government authority with a particular religion and religious message in violation of the Establishment Clause.

**CONCLUSION**

Plaintiffs' First Amended Complaint requests the following relief: a declaratory judgment that Defendants' actions and policies violate the Establishment Clause of the First Amendment to the Constitution; a permanent injunction enjoining Defendants, their successors, and in any person in active concert with Defendants from intentionally, knowingly, recklessly, or negligently allowing field trips to Victory or similar religious venues; judgment for nominal damages; and attorneys' fees, expenses and costs. After applying the *Lemon* factors to the undisputed facts concerning the relationship of the Joplin District to Victory, the Court finds that relationship, and in particular the seventh and eighth grade field trips and sex education programming, violates the Establishment Clause of the First Amendment to the Constitution.

WHEREFORE, for the reasons stated herein, the Court hereby finds in favor of Plaintiffs and against Defendants and **GRANTS** Plaintiffs' Motion for Summary Judgment and **OVERRULES** Defendants' Motion for Summary Judgment. Further, based on the Court's rulings on summary judgment, the Court **GRANTS** the parties 10 days from the date of this order to submit proposed language, if any, for the Court's consideration in preparing a final order and judgment.

**IT IS SO ORDERED.**

Date: March 9, 2017

*/s/ Douglas Harpool*____________________
**Douglas Harpool**
**United States District Judge**